## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REACH ACADEMY FOR BOYS AND | : | |
| GIRLS, INC., O.G., by her parent and | : | |
| next friend, T.W., by her parent and next | : | |
| friend, T.W., by her parent and next | : | |
| friend, S.O., by her parent and next | : | |
| friend, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 13-1974-LPS |
| | : | |
| DELAWARE DEPARTMENT OF | : | |
| EDUCATION and MARK MURPHY in | : | |
| his capacity as Secretary of the Delaware | : | |
| Department of Education, | : | |
| | : | |
| Defendants. | : | |

Duane D. Werb, WERB & SULLIVAN, Wilmington, DE

Charles J. Brown, III, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, DE

 Attorneys for Plaintiffs.

Catherine T. Hickey, Joseph Clement Handlon, Kenisha LaShelle Ringgold,
DEPARTMENT OF JUSTICE, Wilmington, DE

 Attorneys for Defendants.

## OPINION

May 30, 2014
Wilmington, Delaware.

**STARK, U.S. District Judge:**

## **INTRODUCTION**

This case arises from unique factual circumstances and presents the Court with difficult issues of first impression implicating the public availability of same-gender education in the State of Delaware. On November 12, 2013, the State of Delaware, through its Department of Education and Secretary of Education ("DOE" or "Defendants"), made the decision not to renew the charter of Reach Academy for Girls ("Reach"), thereby effectuating the closing of the only all-girls public school in the State of Delaware. Reach filed suit in federal court, alleging violations of Equal Protection, Title IX of the Education Act (20 U.S.C. § 1681), Due Process, and two provisions of Delaware's Charter School Act (14 Del. C. §§ 506 & 514A). (D.I. 1) ("Complaint") The Complaint is also filed on behalf of individual students at Reach through their parents and guardians[1] ("Individual Plaintiffs" and, with Reach, "Plaintiffs"). In their suit, Plaintiffs seek an order that Defendants renew Reach's charter for a five-year term.

Plaintiffs filed a Motion for a Preliminary Injunction (D.I. 7) and Defendants filed a Motion to Dismiss. (D.I. 10) After a hearing on January 2, 2014, on January 3 the Court granted in part and denied in part Defendants' Motion to Dismiss and granted Plaintiffs' Motion for a Preliminary Injunction. (D.I. 18) Although the Court issued an 11-page Memorandum Order at that time, it stated it would provide further explanation in a later opinion. Today's Opinion sets forth in detail the reasoning of the Court.[2]

---

[1] The students are O.G., T.W., another T.W., and S.O., each student by her parent and next friend. (D.I. 1)

[2] The parties filed a stipulation of dismissal on May 2, 2014. (D.I. 31) The Court subsequently sought the parties' views as to whether the Court should adhere to its plan and issue

1

## BACKGROUND

### Factual Background

In 1996, the Supreme Court issued its decision in *United States v. Virginia* ("*VMI*"), 518 U.S. 515 (1996), relating to state-sanctioned schools that deny applicants admission on the basis of gender. The Supreme Court held that "Virginia's categorical exclusion of women from the educational opportunities [the Virginia Military Institute] provides denies equal protection to women;" "[n]either federal nor state government acts compatibly with equal protection when a law or official policy denies to women, simply because they are women, full citizenship stature – equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *Id.* at 515-16. In 2006, the United States Department of Education ("U.S. Department of Education") issued regulations relating to the requirements for the opening and operation of same-sex schools receiving federal funding pursuant to the No Child Left Behind Act of 2001, 20 U.S.C. § 6301 *et seq. See generally* 34 C.F.R. § 106.34.

In 2008, the Delaware General Assembly amended its charter school laws in accordance with the U.S. Department of Education regulations to allow applicants an opportunity to apply for and create same-gender charter schools. *See* 76 Del. Laws ch. 202, §§ 1-6 (2008) (codified at 14 Del. C. § 506(a)(3)).[3] However, this opportunity was made available for only a limited period. Section 506 limits the acceptance of applications for a same-sex charter school by providing that "[t]he same-gender charter school provisions shall sunset, for any new charter

---

this opinion, and no party objected.

[3]The Court uses the terms "same-sex" and "same-gender" interchangeably throughout this Opinion, and does the same with the terms "single-sex" and "single-gender."

2

applications, on June 30, 2013, unless the General Assembly has otherwise acted to extend such

date prior to its expiration." 14 Del. C. § 506(a)(3)e.

At the time Section 506 was adopted, Delaware had one all-boys school, Prestige

Academy, and no all-girls charter school. The new law reflects this state of affairs, providing:

> [T]he Department of Education, with approval of the State Board
> of Education, shall be considered the approving authorizer of
> Prestige Academy, a same-gender school, and shall provide
> oversight to such school. The Department of Education, with the
> approval of the State Board, may waive any provisions in this
> Chapter that would limit the school from opening for the
> 2008-2009 school year. Any subsequent same-gender charter
> school shall make its application to the Department of Education
> and the State Board of Education.

14 Del. C. § 506(a)(3)c. Subsection 506(a)(3)d calls for the creation of a "substantially equal"

"same-gender charter school of the opposite gender . . . matching in grade level and marketed

towards similar demographics [as Prestige Academy]."

In 2009, Reach was approved as the all-girls counterpart to Prestige, and in 2010 Reach

began conducting classes for several grade levels. (D.I. 1 ¶¶ 8, 10, 20 n.1) From the very start,

Reach had difficulties. Less than two months after opening its doors to its first students, Reach

came under the scrutiny of the DOE for financial mismanagement and was placed under formal

review. (D.I. 1 ¶¶ 10-12) With the school threatened with closure, Reach's Board of Directors

was in turmoil, and in May 2011 all of the directors resigned. (D.I. 1 ¶ 13-15) Under the

direction of a new board, in June 2011 Reach filed suit in the Delaware Court of Chancery

seeking to enjoin the DOE from closing Reach. (D.I. 1 ¶ 16) Before the Chancery Court was

required to make any ruling on the merits, the DOE and Reach came to an agreement whereby

the DOE recommended that Reach remain open but also be placed on probation. (D.I. 1 ¶ 18)

3

Under new leadership, enrollment for the 2012-2013 school year was robust, as Reach expanded from offering four grade levels (kindergarten, first, fifth, and sixth) in the 2010-2011 school year to now offering eight grade levels (kindergarten through third and fifth through eighth). (D.I. 1 ¶ 20 n.1) Because state funding for a charter school is based on its enrollment in September of any given year, the number of students enrolled at a charter school is key to its continued viability. (D.I. 1 ¶ 10) Reach's increased enrollment meant an improved financial status, and in May 2013 the DOE removed Reach from probation. (D.I. 1 ¶ 19) In June 2013, the DOE approved a modification of Reach's charter and authorized it to enter into a long-term lease to occupy a recently-vacated school complex. (D.I. 1 ¶ 22)

Reach's application for a renewal of its charter was due in September 2013. In July 2013, Reach students' results on the Delaware Comprehensive Assessment Scores ("DCAS"), the statewide test used to monitor student performance, were poor. The scores placed Reach students' performance in Delaware's lowest-performing category of "Falls Far Below Standard" in both math and reading, resulting in an overall school rating of "F." (*See* D.I. 9 ex. A)[4]

Coinciding with Reach's impending renewal deadline was a July 2013 amendment to the Delaware Code, which changed the renewal process for charter schools; the DOE's charter application procedure was also revised. *See* 79 Del. Laws ch. 51, §§ 1-2 (July 1, 2013); *see also* D.I. 11 ex. A at 7-8; D.I. 7 ex. 4 ¶ 3. Amended 14 Del. C. § 514A(c) now mandates that the DOE issue a renewal report by April 30th to provide guidance to charter schools in danger of

---

[4]It may be that Reach's influx of students contributed to the low scores. For grades five through eight – the grades represented in Reach's DCAS scores – 82% of Reach's students enrolled with scores below proficient in math, and 68% enrolled with scores below proficient in reading. (D.I. 7-1 ex. 4 ¶¶ 12-13; *see also* D.I. 14 App. at A91 (noting that there were only 23 students who had attended Reach for three years))

4

non-renewal. Reach did not benefit from this amendment, however, since Reach's renewal application year was 2013 and the amendment was adopted after April 30, 2013. Similarly, the timing of the DOE's revision to its charter application process had the effect of truncating the time available for Reach to prepare its renewal application from seven months to three months. (D.I. 7 ex. 4 ¶ 3)

Reach submitted its charter renewal application by the deadline of September 30, 2013. (D.I. 1 ¶ 26) On October 7, Reach met with the Charter School Accountability Committee ("CSAC") to discuss its renewal application. On October 15, the CSAC – citing the poor performance of Reach's students – issued a preliminary report recommending that Reach's charter not be renewed. (D.I. 1 ¶ 27; *see also* D.I. 14 App. at A85) On October 23, a public hearing lasting several hours was held in Dover, Delaware at which Reach students and their parents testified about the school's significance in the community. (D.I. 1 ¶ 28; *see also* D.I. 3 ex. D) After receiving supplemental materials responding to concerns raised at the October 15 meeting, the CSAC met once more on November 4 to discuss Reach's renewal application. (D.I. 1 ¶ 29; *see also* D.I. 14 App. at A115-20) On November 6, a second public hearing was conducted, during which Reach made a final effort to persuade the DOE to grant its application, including by presenting testimony from representatives of the NAACP and submitting data related to the recent test scores of Reach students. (D.I. 1 ¶ 30; D.I. 3 exs. E, G) These efforts failed and the next day the CSAC issued its final report recommending denial of Reach's renewal application. (D.I. 1 ¶ 32; D.I. 14 App. at A121) On November 12, Reach's application for renewal was officially denied when Secretary Murphy informed the State Board of Education

5

that he was not recommending renewal of Reach's charter.[5] (D.I. 1 ¶ 34)

**Procedural Background**

On November 25, 2013, Reach and several of its students filed this suit against the

Delaware Department of Education and Secretary Mark Murphy. Plaintiffs assert five causes of

action: (1) deprivation of their constitutional right to equal protection under the Fourteenth

Amendment and 42 U.S.C. § 1983; (2) a discrimination action under Title IX of the Educational

Amendments of 1972, 20 U.S.C. § 1681; (3) a violation of their right to due process under the

Fourteenth Amendment and 42 U.S.C. § 1983; (4) violations of Delaware law relating to 14 Del.

C. § 506; and (5) violations of Delaware law relating to 14 Del. C. § 514A. (D.I. 1) On

December 11, 2013, Plaintiffs filed an emergency Motion for a Preliminary Injunction[6] seeking a

temporary stay of the DOE's decision in advance of a critical application deadline of January 8,

2014, the date by which parents are required to file "choice" requests for student placement for

the 2014-15 school year. (D.I. 7)

After ordering and receiving letters concerning Plaintiffs' motion (D.I. 8, 9), on

December 13 the Court held a teleconference to discuss how the case would proceed. At the

conclusion of the teleconference, the Court directed the parties to complete, by December 30, all

briefing on the preliminary injunction motion as well as a motion to dismiss Defendants intended

---

[5]Although the State Board is required to assent to the Secretary's decision to approve a charter or revoke a charter, the Secretary's decisions denying non-renewal of a charter are final. *See* 14 Del. C. §§ 511(c), 514A(f); *see also* 14 DE Admin. Code 275.10.3 ("Charters shall be renewed only if the school receives a satisfactory performance review.").

[6]Plaintiffs initially requested relief in the form of a temporary restraining order or a preliminary injunction. (D.I. 7) The Court, after conferring with the parties, decided to proceed only on the preliminary injunction. (*See* Dec. 13, 2013 Hr'g Tr. at 27)

6

to file.  The Court expressed the view it was in all parties' interest to expedite proceedings given

the impending January 8 choice deadline.  (*See* Dec. 13 Hr'g Tr. at 27-32)

On January 2, 2014, the Court heard oral argument on both motions.  (*See* D.I. 12-13)

The next day, January 3, the Court issued its memorandum order granting in part and denying in

part Defendants' Motion to Dismiss, and granting Plaintiffs' Motion for a Preliminary Injunction.

(D.I. 18)  Specifically, the Court dismissed Plaintiffs' Due Process and state law claims, and

dismissed Reach as a party due to lack of standing.  (*Id.*)  The Court found that the Individual

Plaintiffs had sufficiently plead claims upon which relief may be granted with respect to Equal

Protection and Title IX.  (*Id.*)  Finally, the Court granted the Individual Plaintiffs' preliminary

injunction motion on the surviving claims and, as relief, extended Reach's charter by one school

year, subject to any reasonable conditions the DOE might impose.  (*Id.* at 10-11)

## MOTION TO DISMISS

### I.      Legal Standards

When presented with a motion to dismiss for failure to state a claim, pursuant to Federal

Rules of Civil Procedure 12(b)(6), courts conduct a two-part analysis.  *See Fowler v. UPMC*

*Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, courts separate the factual and legal elements

of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any

legal conclusions."  *Id*. at 210-11.  This step requires courts to draw all reasonable inferences in

favor of the non-moving party.  *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000).

However, courts are not obligated to accept as true "bald assertions," *Morse v. Lower Merion*

*Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted

inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.

1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is a context-specific determination, requiring the court "to draw on its judicial experience and common sense." *Id*. at 679. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). Courts may consider exhibits attached to the complaint, matters of public record, and "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

When a Rule 12(b)(6) motion relies on the absence of Article III standing, it is analyzed pursuant to Federal Rule of Civil Procedure Rule 12(b)(1). *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (noting that standing is "threshold jurisdictional question"). Motions brought under Rule 12(b)(1) may present either facial or factual challenges to a court's subject matter jurisdiction. *See Mortensen v. First Fed. Sav. &*

8

*Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial challenge, which contests only the sufficiency of the pleadings, is subjected to an analysis identical to that of a Rule 12(b)(6) motion; thus, a court considers "only . . . the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Here, Defendants' motion is properly construed as a facial challenge because Defendants "accept[] as true" the "facts set forth in the Complaint" but nevertheless contend that the allegations are insufficient to "state[] a plausible claim for relief." (D.I. 11 ¶ 1)

## II.    Standing

The Court agrees with Defendants that Reach lacks standing to press any of the claims in the complaint. (D.I. 11 ¶¶ 11-12) To establish standing, a plaintiff must satisfy three requirements: (1) an injury in fact, which is an invasion of a legally-protected interest that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical;'" (2) a causal connection between the injury and the conduct complained of; and (3) it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

### A.    Reach as Charter Holder and Reach as Charter School

Defendants argue that Reach lacks standing because charter schools have a legal status equivalent to that of a school district, and a school district lacks standing to sue the State that created it.[7] (D.I. 11 ¶ 12) Reach counters that it brings suit in its capacity as a charter holder

---

[7]The Court need not address Defendants' additional argument that Reach lacks third party standing (D.I. 11 ¶ 12), as Reach does not assert it has standing on this basis.

9

rather than as a charter school and, thus, should not be viewed as like a school district. Nevertheless, Reach further argues it would have standing as a charter school because it is bringing claims under the Supremacy Clause. (D.I. 15 at 5-7)

As a threshold matter, the Court must examine the distinction between a charter holder and a charter school. If Reach Academy for Boys and Girls, Inc. as the holder of a charter, is a legally distinct entity from the charter school Reach Academy for Girls, then the standing inquiry may be affected. Plaintiffs contend that "[w]hereas Reach might have an issue suing Defendants in its capacity as a Charter School, that fact should not preclude it from filing suit in its capacity as a private Delaware corporation that is a Charter Holder." (D.I. 16 at 4) In attempting to distinguish between the corporate entity and the school, Plaintiffs observe that, absent judicial relief, "the school itself will cease to exist. In the event of non-renewal, Reach, on the other hand, will not cease to exist but will still be a private non-profit corporation with assets and liabilities that have to be administered pursuant to its corporate charter and its by-laws." (D.I. 15 at 8)

At least one court has held that this distinction makes a difference. In *Project Reflect, Inc. v. Metro. Nashville Bd. of Pub. Educ.*, 947 F. Supp. 2d 868, 875 (M.D. Tenn. 2013), the court found that the Plaintiff before it was the charter school sponsor, not the charter school, obviating the need for a standing analysis. *Id.* The court based its conclusion on the clear distinction in Tennessee law between a sponsor and a charter school: "[t]he sponsor – as distinguished from the 'governing body of the public charter school' – plays a key role in applying for a charter, appealing its disapproval, and, if approved, signing the written agreement, 'which shall be binding upon the governing body of the public charter school.'" *Id.* Defendants

10

assert that, in Delaware, no such distinction exists: "Reach Academy for Girls and Reach Academy for Boys and Girls, Inc. are not separate legal entities. The former is a 'd/b/a' of the latter. . . . Reach Academy for Girls could only sue the state in its corporate name." (D.I. 17 at 4) In this way, according to Defendants, Delaware's charter school regime is different from that involved in Tennessee's *Project Reflect* case. (D.I. 17 at 4)

Defendants are correct. Generally speaking, Delaware law makes no substantive distinction between a charter holder and a charter school. *See generally* 14 DE Admin. Code 275.2.1. Beyond the initial application process, a charter holder does not exist or act separately from the charter school; among other things, the two share a common board of directors. *See* 14 DE Admin. Code 275.2.1 (defining board of directors of charter school as board of directors of applicant at time of charter approval). Delaware law makes explicit that a charter school's board of directors is deemed a public body with the same standing and authority, except for the power to tax, as a board of education of a traditional public school district. *See* 14 Del. C. §§ 503, 1041(1). The situation is different in Tennessee, where a sponsor is a distinct entity separate from the governing body of the charter school, possessing the power to bind the governing body to contracts. *See Project Reflect*, 947 F. Supp. 2d at 875. Unlike the situation in *Project Reflect*, Reach's operations are limited to the operation of the charter school, as Delaware law does not permit a charter holder to operate any business except a charter school. 14 DE Admin. Code 275.4.1.3.2.

Thus, the Court finds no legally cognizable distinction between Reach's capacity as a charter holder and Reach's capacity as a charter school as affects the standing analysis.

11

### B.   Reach's Standing is Equivalent to that of a School District

A political subdivision "created by a state for the better ordering of government, has no

privileges or immunities under the Federal Constitution which it may invoke in opposition to the

will of its creator." *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933); *see*

*also Coleman v. Miller*, 307 U.S. 433, 441 (1939) ("Being but creatures of the State, municipal

corporations have no standing to invoke the contract clause or the provisions of the Fourteenth

Amendment of the Constitution in opposition to the will of their creator."). Nonetheless, courts

recognize an exception in actions against the state arising under the Supremacy Clause of the

U.S. Constitution. *See Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist*, 908 F.

Supp. 2d 597, 612 (M.D. Pa. 2012) ("[C]ourts that have allowed a municipality or municipal

corporation to assert claims against its creator have generally permitted claims only for violations

of the Supremacy Clause.").

Delaware law unambiguously provides that the legal status of a charter school is

equivalent to that of a public school district. *See* 14 Del. C. §§ 503, 504. Unlike *Pocono*

*Mountain* and *Project Reflect* – where the state law was silent with respect to the charter school's

capacity to bring suit – in Delaware the statute expressly provides that "[a] charter school may

sue or be sued to the same extent and on the same conditions as a public school district." 14 Del.

C. § 504(d); *see also Pocono Mountain*, 908 F. Supp. 2d at 607 (Pennsylvania charter schools

may be sued to same extent as political subdivisions); *Project Reflect*, 947 F. Supp. 2d at 874

(Tennessee charter schools may sue and be sued without qualification). Hence, just as school

districts are political subdivisions, *see* 14 Del. C. § 1002(3), (5); *see generally Davis v. Thomas*,

2009 WL 3112318 (D. Del. Sept. 25, 2009); *Beck v. Claymont Sch. Dist.*, 407 A.2d 226, 229

12

(Del. Super. Ct. 1979), so, effectively, are charter schools, and charter schools lack capacity to bring suit against the state.

### C.      Reach Lacks Standing

As it is a charter school, Reach lacks standing to sue Defendants.  Nonetheless, Reach analogizes itself to school districts that were found by the Supreme Court to have standing to sue the State of Washington concerning desegregation laws in *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982).  In *Seattle School District*, 458 U.S. at 464, three school districts sued the state to bring an equal protection challenge to a ballot initiative approved by popular vote.  However, as the Middle District of Pennsylvania explained in *Pocono Mountain*, 908 F. Supp. 2d at 613, *Seattle School District* did not expressly address the issue of standing and, thus, "does not establish a binding rule that a school district can sue the state." *Id.*; *see also Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 266 (3d Cir. 2009) ("The Supreme Court has 'repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect.'").  *Seattle School District*, then, does not help Reach.

Reach also cites to *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), an example of a case in which suits by municipalities against states have been permitted for violations of the Supremacy Clause.  Here, the Complaint does not mention the Supremacy Clause, and Reach provides no persuasive basis for viewing its claims as alleging a violation of the Supremacy Clause.

Therefore, the Court concludes that Reach lacks standing and the claims it asserts must be dismissed.

13

## III. Procedural Claims[8]

Plaintiffs[9] allege that "[p]rocedural due process requires some minimal notice and an opportunity to be heard." (D.I. 1 ¶ 59) Specifically, in Count III Plaintiffs allege a violation of the Due Process Clause; in Count IV they allege a violation of 14 Del. C. § 506(d), due to a lack of sufficient technical assistance from Defendants (D.I. 1 ¶¶ 76-82); and in Count V Plaintiffs allege that Defendants violated 14 Del. C. § 514A by not providing adequate notice under state law (D.I. 1 ¶¶ 83-89). The Court concludes that Plaintiffs lack a cognizable property interest in the renewal of Reach's charter and, further, that Plaintiffs received adequate notice and procedure.

### A. Fourteenth Amendment Procedural Due Process

When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, courts undertake a two-stage inquiry: determining (1) whether "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property;'" and (2) whether the procedures available provided the plaintiff with "due process of law." *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984). Property rights are not created by the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure benefits and that support claims of entitlement to those

---

[8]Plaintiffs appeared to concede at oral argument that the Individual Plaintiffs are parties only to Counts I and II, that is the Equal Protection and Title IX claims. (*See* Jan. 2 Hr'g Tr. (hereinafter "Tr.") at 55) As the Complaint is unclear on this point, the Court will address all five claims.

[9]All references to "Plaintiffs" in the remainder of this opinion are solely to the Individual Plaintiffs.

benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

The interest Plaintiffs assert, the renewal of Reach's charter, is not an interest protected by the Fourteenth Amendment's Due Process Clause. Delaware law provides that a charter "*may* be renewed for successive 5-year terms," vesting the DOE with the discretion to renew or not renew charters. 14 Del. C. § 514A(b) (emphasis added). Just as no protected property interest was found in other cases involving charter schools, neither, here, do Plaintiffs have such an interest. *See Jackson v. Pocono Mountain School District*, 2010 WL 4867615, at *4 (M.D. Pa. Nov. 23, 2010), *aff'd Pocono Mountain Charter School v. Pocono Mountain School District*, 442 Fed. App'x. 681, 684 (3d Cir. Aug. 25, 2011); *Project Reflect*, 947 F. Supp. 2d at 878-79; *Pinnacle Charter School v. Board of Regents*, 969 N.Y.S.2d 318, 320 (N.Y. App. Div. 2013) ("[T]he New York Charter Schools Act . . . creates no constitutionally protected property interest in the renewal of a charter . . . ."); *State ex rel. Sch. Dist. of Kansas City v. Williamson*, 141 S.W.3d 418, 427 (Mo. Ct. App. 2004) ("[J]ust as a prospective charter school has no protected property interest at stake regarding an initial charter application, the school also has no protected property interest under the Charter Schools Act with regard to renewal of its charter.").

Even if Plaintiffs had a protected property interest, they were provided with constitutionally adequate processes. Plaintiffs allege that "Reach was exposed to a terribly flawed process" (D.I. 7-1 at 18), consisting of "sham public hearings that do no more than pay lip service to the concept of due process" (D.I. 15 at 2), which subjected Reach to a "kangaroo process in a quasi-star chamber environment" (*id.* at 6), culminating in Defendants' "knee-jerk response" (D.I. 1 ¶ 88) to use Reach as its "sacrificial lamb" (D.I. 1 at 25). The materials which the Court is permitted to consider at this stage establish that Plaintiffs' allegations cannot be

15

proven.

Renewal decisions for a five-year extension of a charter must result from a process involving (a) grounding in evidence of the school's performance over the term of the charter, (b) data used that is made available to the school and the public, and (c) a public report summarizing the evidentiary basis for each decision. (D.I. 14 at 6) (*citing* 14 Del. C. § 514A(g)) Here, after Reach submitted its renewal application on September 30, the CSAC met with Reach to discuss the application, before the CSAC issued its preliminary report on October 15. (D.I. 1 ¶¶ 26-27) The DOE then held a public hearing and gave Reach an opportunity to submit supplemental materials in support of the application, after which the CSAC met before making its final determination of non-renewal on November 4. (D.I. 1 ¶ 29; *see also* D.I. 14 App. at A102-114 (containing supplemental materials)) Plaintiffs were then afforded another hearing, before the CSAC issued its report recommending non-renewal and Secretary Murphy later made his final decision of non-renewal on November 12. (D.I. 1 ¶¶ 30-34) Plaintiffs had access all along to the data Defendants were using to assess the application. While there is some evidence that Defendants may not have fully comported with state law,[10] "Section 1983 . . . may not be invoked every time local officials allegedly act contrary to state or local procedural law." *Mullen v. Thompson*, 31 Fed. App'x. 77, 79 (3d Cir. Mar. 25, 2002). Plaintiffs' Due Process claims must be dismissed.

---

[10]At oral argument, Defendants admitted that Secretary Murphy may not have had access to all materials in the record when he made his decision (although Defendants maintain he had access to the underlying data). (*See* Tr. at 38-40) The regulations require all decisions to be "base[d] on the record." 14 DE Admin. Code 275.3.8.

16

## B. State Law Claim under 14 Del. C. § 506

In Count IV, Plaintiffs allege that "at no point during Reach's initial application process through its initial five year term did DOE provide any technical assistance to Reach regarding its academic program." (D.I. 7-1 at 3) Plaintiffs contend this is a violation of 14 Del. C. § 506(a)(3)d, which requires the DOE to "work with the education community on a plan for recruitment *and technical assistance* for applicants of a same-gender charter school of the opposite gender [from Prestige]" (emphasis added). Specifically, Plaintiffs claim that "[i]f not explicit, at least implicit, in the mandate . . . to render technical assistance to Reach is that this obligation does not end the minute that DOE approved the Reach charter but . . . continues so as to ensure that the State of Delaware . . . provide[s] equal education opportunities to both genders." (D.I. 1 ¶ 77)

Section 506(a)(3)d mandates technical assistance to assist in the initial creation of a charter school similar to Prestige, meaning that the DOE was statutorily obligated to assist Reach with its initial application. The statute does not require the DOE also to ensure Reach's success by providing it with technical assistance on an ongoing, continuous basis. Hence, Count IV must be dismissed.

## C. State Law Claim under 14 Del. C. § 514A

Invoking 14 Del. C. § 514A, Plaintiffs contend, "Reach was never advised that its charter was in jeopardy of non-renewal as *current state law mandates*." (D.I. 7-1 at 19) (emphasis added) Section 514A(c) provides that "[n]o later than April 30, the approving authority shall issue a charter school renewal report and charter renewal application guidance to any charter school whose charter will expire the following year." However, as Defendants observe, this

17

section was not added to Delaware law until June 2013 – well after the April 30 deadline in the statute. The renewal report deadline did not exist prior to the June 2013 amendment. (D.I. 11 ¶ 33 (citing 79 Del. Laws ch. 51, §§ 1, 2 (effective July 2013)))  Plaintiffs cannot prove that Defendants' failure to comply with a timing requirement that did not exist at the relevant time was a violation of Plaintiffs' rights. Thus, Count V must also be dismissed.

## IV.  Discrimination Claims

Plaintiffs allege that the decision to close Reach, combined with the sunset provision of Section 506, creates a situation that indefinitely deprives Delaware girls, but not Delaware boys, of the opportunity to attend a state-provided same-sex school. (D.I. 1 ¶¶ 47-51)  As the Court held previously, the Individual Plaintiffs have standing to pursue their Equal Protection and Title IX claims ("Discrimination Claims"). (D.I. 18 ¶ 3)  The Individual Plaintiffs allege an invasion of a legally-protected interest to be free from discrimination based on gender, a concrete and particularized injury of not being afforded the benefits of single-gender education, which – due to Defendants' decisions – is not merely speculative. (D.I. 1 ¶ 2)  Defendants do not appear to contest the Individual Plaintiffs' standing to pursue the Discrimination Claims. (*See* Jan. 2 Hr'g Tr. at 68-69)  Rather, Defendants argue that, as a matter of law, the Equal Protection Clause and Title IX are not violated when a state has only one same-sex charter school. (D.I. 11 ¶¶ 14-18)

The parties are in agreement that, at least for some students, there may be inherent benefits in single-gender education. (Tr. at 69 ("Certainly, the Court can take judicial notice of the fact that single-gender education is more beneficial than coed education and therefore they have alleged an injury in fact."))  Defendants contend, however, that "so long as the state makes available to one gender 'education equal' – in whatever form – to [the single-gender public

18

school offering] available for the other gender," then neither the Equal Protection Clause nor

Title IX are violated. (D.I. 11 ¶ 14) Defendants cite to the U.S. Department of Education's

regulations under 34 C.F.R. § 106.34(c)(1) in support of their position, as these federal

regulations provide that "a recipient . . . must provide students of the excluded sex a substantially

equal single-sex school or *coeducational school*." (D.I. 11 ¶ 16) (emphasis added)

The Court disagrees with Defendants. The closure of Delaware's only publicly-funded

all-girls school without any opportunity for another publicly-funded all-girls school even to be

considered, while the State funds the all-boys Prestige Academy, states a claim that survives a

motion to dismiss. Therefore, the Discrimination Claims as brought by the Individual Plaintiffs

will not be dismissed.

## PRELIMINARY INJUNCTION

### I.    **Legal Standards**

A preliminary injunction is an "extraordinary remedy," and courts consider four factors

when faced with a request to grant one. *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151,

153 (3d Cir. 1999). They are:

> (1) whether the movant has shown a reasonable probability of
> success on the merits;[11]
>
> (2) whether the movant will be irreparably injured by denial of
> relief;
>
> (3) whether granting preliminary relief will result in even greater
> harm to the nonmoving party; and

---

[11]The Third Circuit uses "reasonable probability of success" interchangeably with
"likelihood of success." *See, e.g., Allegheny Energy, Inc. v. DOE, Inc.*, 171 F.3d 153, 158 (3d
Cir. 1999).

(4) whether granting the preliminary relief will be in the public
interest.

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997).

## II.    Mandatory Injunction

Defendants assert that Plaintiffs are seeking a mandatory injunction, an even more

extreme form of relief, which imposes a "particularly heavy" burden on Plaintiffs to make a

showing under each prong of the applicable legal standard. (D.I. 14 at 13) (citing *Punnett v.

Carter*, 621 F.2d 578, 582 (3d Cir. 1980)) Defendants characterize Plaintiffs' requested relief as

an injunction that would alter the status quo. In Defendants' view, the status quo is that Reach

Academy's charter will terminate at the end of the school year, so Reach Academy will be

shutting its doors. (*See* D.I. 14 at 13; *see also* Tr. 61 ("[T]he renewal decision has already been

made. They're [Plaintiffs] seeking to undo that.")) To Defendants, then, the relief Plaintiffs are

seeking by their motion – the extension of Reach's charter, allowing Reach to operate in the

2014-15 school year – would alter the status quo, resulting in a mandatory injunction.

Plaintiffs counter that the injunction they seek would, instead, preserve the status quo.  To

Plaintiffs, the "status quo is that the individual Reach students, and Delaware female students in

general, are attending, or have an option to attend, a single gender public school just like the

option that is available for the male students through Prestige Academy." (D.I. 16 at 1)  From

this perspective, "[i]t is only through an extension of the Reach Charter for one year that the

status quo can be preserved." (D.I. 16 at 1)  In Plaintiffs' view, then, the ordinary preliminary

injunction standard applies.

Neither side is completely correct.  The status quo is that the Individual Plaintiffs are

20

attending Reach Academy, and may do so for the remainder of the current school year, but are

not permitted to choose to attend Reach Academy for the 2014-15 school year, since Reach

Academy will not be permitted to operate in 2014-15. Thus, the preliminary relief Plaintiffs seek

would alter the status quo. However, that alteration is not truly analogous to the injunctions

involved in the cases on which Defendants rely for their heightened standard. In *Hart Intercivic,*

*Inc. v. Diebold, Inc.*, 2009 WL 3245466, at *1 (D. Del. Sept. 30, 2009), this Court determined

that the mandatory preliminary injunction standard applied where the plaintiffs' requested relief

was a mandatory divestiture of a corporation's stock and holdings after a merger had already

been effectuated. In *Punnett v. Carter*, 621 F.2d at 580, the plaintiffs sought an injunction

requiring the government to issue public warnings to U.S. Army Servicemen of the potential

mutagenic effects of exposure to nuclear testing.

　　These cases are simply not comparable to the circumstances presented here. Reach is

presently open and has all the resources to enable it to be operating in the 2014-15 school year. It

is not as if Plaintiffs are asking the Court to order Defendants to create a new school out of

nothing. Thus, the Court finds the mandatory injunction standard inapplicable.

## III.　Likelihood of Success on the Merits

　　In Counts I and II, Plaintiffs challenge "the decision of DOE to deny Reach's charter

renewal application," asserting claims pursuant to 42 U.S.C. § 1983 and Title IX based on

allegations that Defendants' decision "depriv[es] the female students of Delaware the same

educational opportunity for a single gender public education that is afforded the male students in

Delaware." (D.I. 1 ¶ 2) Plaintiffs contend that, due to the sunset provision of Section 506(a)(3)e,

"the closure of Delaware's only all-girls charter school" will have the effect of "depriving the

21

female students in Delaware now and forever from having access to the same single gender educational opportunities that are afforded to the male students in Delaware." (D.I. 7-1 at 8) Defendants respond that Plaintiffs' Discrimination Claims are "based upon the faulty premise that it is a *per se* violation of the Equal Protection Clause and Title IX for a state to have a single-gender public school for one gender and not the other." (D.I. 14 at 15)

Defendants correctly note the absence of any "compelling authority demonstrating that [Plaintiffs] will succeed on the merits." (D.I. 14 at 26) However, this asks too much – Plaintiffs are not required to cite "compelling" authority nor show they certainly "will" prevail. Instead, at this stage of the proceedings, Plaintiffs have met their burden to show that indefinitely depriving Delaware's girls of access to same-gender education, while at the same time providing that option to Delaware's boys for at least several more years, is likely to be found to be a violation of Plaintiffs' rights under the Equal Protection Clause and Title IX.

## A.     Likelihood of Success on Count I

Section 1983 prohibits the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (internal quotation marks omitted). To prevail on a Section 1983 claim, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged deprivation was committed by a person acting under color of state law. *See Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).

Plaintiffs claim they were deprived of equal protection of the laws under the Fourteenth

Amendment. (D.I. 1 ¶¶ 47-51) The Fourteenth Amendment's Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005). "In other words, they must demonstrate that they received different treatment from that received by other individuals similarly situated." *Id.* In the context of a sex discrimination claim, plaintiffs must show that this disparate treatment was based upon gender.

Gender classifications under law are not inherently "proscribed classification[s]." *United States v. Virginia*, 518 U.S. at 533. Indeed, they may be used in a variety of legitimate ways, such as "to compensate women 'for particular economic disabilities [they have] suffered,' to 'promot[e] equal employment opportunity,' [or] to advance full development of the talent and capacities of our Nation's people." *Id.* (internal citations omitted). But because gender classifications have historically been used "to create or perpetuate the legal, social, and economic inferiority of women," courts review classifications based on gender to determine "whether the proffered justification is 'exceedingly persuasive.'" *Id.* at 533-34. The burden on Defendants, then, is demanding, as they must show that the "[challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* at 533.

Defendants contend that equal protection is not typically violated when a state offers optional, single-gender public schools, so long as the state makes available to both genders "education equal" options. *See Vorchheimer v. School Dist. of Philadelphia*, 532 F.2d 880, 886

23

(3d Cir. 1976). However, as Plaintiffs observe, "[d]ue to the sunset provision of 14 Del. C. § 506, Reach is the only option that is available to Defendants to comply with Federal law and provide female students with an educational option that is comparable to that of the male students at Prestige Academy." (D.I. 16 at 16 (citing 14 Del. C. § 506(a)(3)e, which prohibits new same-gender charter schools after June 30, 2013)) To Plaintiffs, there is an inherent benefit – for at least some boys, and at least some girls – to same-gender education, and Delaware may not provide these benefits to one gender but not the other.

Plaintiffs are likely to succeed in showing that there are unique benefits to same-gender schooling opportunities for at least some students. Defendants state in their Reply that they "do not dispute that single-gender education has potential benefits and is, in obvious respects, different from coed education." (D.I. 17 ¶ 21) This is consistent with the apparent policy decision of Delaware's lawmakers, who by enactment of the amended Section 506 mandated the creation of two same-gender charter schools. Given the conceded benefits of same-sex education for some students, and not just boys, Defendants have failed to show that providing such benefits to boys while depriving girls of the same benefits serves important governmental objectives.

Defendants argue that "there are no allegations in the Complaint that Defendants took any action based on the gender of Reach students," and therefore the Individual Plaintiffs have failed to show the purposeful discrimination required for an Equal Protection violation. (D.I. 17 ¶ 24) Defendants continue: "[T]hat their decision not to renew Reach's charter results in the elimination of the only single-gender charter school for girls does not make their decision gender-based governmental action. At least, Plaintiffs provide the Court with no support for it to reach such a conclusion." (*Id.*) But this analysis ignores the additional fact that the State of

24

Delaware – including Defendants – is not even permitted to consider offering the same benefits

to girls that it currently provides to boys.  On the facts here – where Delaware is providing its

boys the opportunity for a single-gender public school education and, for no articulated reason, is

forever depriving its girls of the same opportunity – Plaintiffs are likely to show an Equal

Protection violation.[12]

## B.     Title IX

In Count II, Plaintiffs contend that the "interplay between the sun-setting provision of 14

Del. C. § 506 and the regulations under Title IX, which encouraged single gender charter schools,

and envisioned equal opportunity for both sexes through the opportunity for multiple single

gender charter schools creates a unique situation in Delaware whereby DOE has a heightened

burden to ensure that Reach remains open in order to promote gender equality."  (D.I. 1 ¶ 7)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  To

prevail, plaintiffs need not show that a defendant purposefully discriminated on the basis of

gender.  *See Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 584 (W.D. Pa. 1993),

*aff'd*, 7 F.3d 332 (3d Cir. 1993); *Mehus v. Emporia State Univ.*, 295 F. Supp. 2d 1258, 1272 (D.

---

[12]A finding that Plaintiffs are likely to succeed on the merits is not, as Defendants
suggest, a "legal conclusion that a single-gender education is so inherently unique that
Defendants are constitutionally required to provide parity."  (D.I. 17 ¶ 19)  It may be that the
State could lawfully fund two all-boys schools and only one all-girls school; it may also be that
the State could lawfully fund one all-boys school and no all-girls schools, so long as the State
was also willing to entertain new applications for single-sex charter schools.  These are not the
facts before the Court, so the Court draws no conclusions as to them.

Kan. 2004).

For all the reasons already stated in connection with Plaintiffs' Equal Protection claim,

Plaintiffs are also likely to succeed on the merits of their Title IX claim.

In arguing for a contrary conclusion, Defendants rely heavily on the federal regulations

issued under Title IX, which appear to contemplate the existence of single-gender charter

schools, even in the absence of single-gender charter schools of the opposite gender. *See* 34

C.F.R. 106.34(c).  The regulations provide:

> (c)  Schools.
>
>> (1)  General Standard.  Except as provided in
>> paragraph (c)(2) of this section, a recipient that
>> operates a public nonvocational elementary or
>> secondary school that excludes from admission any
>> students, on the basis of sex, must provide students
>> of the excluded sex a substantially equal single-sex
>> school or coeducation school.
>>
>> (2)  Exception.  A nonvocational public charter
>> school that is a single-school educational agency[13]
>> under State law may be operated as a single-sex
>> charter school without regard to the requirements in
>> paragraph (c)(1) of this section.

Thus Defendants conclude that, "Plaintiffs' [discrimination claims] fail[] because there is no

claim or proof that Reach students do not have educational opportunities substantially equivalent

to a single-gender, all-male school." (D.I. 14 at 3)

---

[13]Public school districts and, in Delaware, charter schools, *see* 14 Del. C. § 503, are
defined as "Local Educational Agencies." *See* 20 U.S.C. § 1401(19) (defining Local Educational
Agency as "public authority" created for "administrative control" of elementary and secondary
schools).

Plaintiffs read Section 106.34(c)(1) – requiring that districts "must provide students of the excluded sex a substantially equal single-sex school or coeducational school" – as meaning that Delaware must provide both options to students of both sexes. To Plaintiffs, in this context "or" means "and," so "[i]n the context of this regulation, the word 'or' is referring to the options that the state has to make available to the excluded sex." (D.I. 16 at 5; *see also id.* at 6 ("This regulation is clearly referring to the options that must be available to the students and does not mean that the state gets to limit the students' options to whatever the state decides."))[14]

The Court finds neither side's reasoning persuasive. Plaintiffs' reading is a stretch. But even Defendants' interpretation does not look as if it would prevent a finding of liability. On Defendants' reading of the regulation, a *school district* and/or a *charter school* may not have to provide single-sex schools to both boys and girls, but this does not mean that the *State* of Delaware, its DOE, and its Secretary of Education may discriminate on a *statewide* level. *See generally* 34 C.F.R. § 106.34(a) ("Except as provided for in this section or otherwise in this part, a recipient shall not provide or otherwise carry out any of its education programs or activities separately on the basis of sex, or require or refuse participation therein by any of its students on the basis of sex."); "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 71 Fed. Reg. 62,530, 62,541 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34(c)(2)) ("With regard to public charter schools, it would be impracticable to require either chartering authorities, which are merely approving applications for – but are not

---

[14]Plaintiffs' idea seems to be that since each student only attends one school (at a time), she need be provided at any one time only with a single-sex "or" coeducational school, but she also must be provided the opportunity to choose between the two options.

27

operating – single-sex charter schools, or the groups of community leaders, developers, or parents who seek to establish a single-sex charter school that will be a single-school LEA under State law, to establish and operate an additional substantially equal school to meet the needs of the other sex.").

Consequently, the Court finds that Plaintiffs are likely to show that Defendants' conduct violated Title IX.

## IV.    Irreparable Injury

To obtain a preliminary injunction, a plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (internal quotation marks omitted).

Plaintiffs argue that, without temporary relief, "Reach faces the impossible task of attempting to retain and recruit students while facing school closure during the critical period that students have for exercising their school choice options." (D.I. 7-1 at 21) Plaintiffs illustrate the potential harm to Reach by describing the financial problems confronted by other charter schools in Delaware that have been threatened with closure. (*Id.* at 21-24) As already noted, funding for charter schools is dependent on enrollment numbers. (D.I. 1 ¶ 10) Plaintiffs thus argue that without a preliminary injunction before the January 8, 2014 deadline for "choice applications" to attend a specific school in the 2014-15 school year, the "DOE's threatened non-renewal of

28

[Reach's] charter obviously [will have] a very negative impact on a parent's willingness to consider Reach as an option for their children," causing a precipitous drop in enrollment and lack of financial viability – even if Plaintiffs prevail at trial. (D.I. 7-1 at 23-24)

Defendants acknowledge that "Reach may be irreparably harmed," but insist "equally if not more important is the irreparable harm to children who continue to attend Reach or plan to attend Reach next year." (D.I. 14 at 26) Defendants urge the Court to deny the preliminary injunction because "[o]n balance, the greater irreparable harm will befall Reach students because the students will be able to attend one of the worst academically performing schools in the State for another year." (*Id.* at 23)

The Court does not agree with Defendants' assertion that granting the requested relief "would *subject* . . . students to another year of an admittedly unacceptable education." (*Id.* at 25) (emphasis added) Nothing, including the Court's order, has compelled any parent to send his or her daughter to Reach. Each Reach student is at Reach by *choice*. Nor did Defendants present evidence to support a finding that parents are choosing to send their daughters to a school they believe will fail them.

Therefore, the Court finds that the Individual Plaintiffs will be irreparably harmed in the absence of an order that Reach's charter be renewed for an additional academic year.[15]

## V.    Balance of Hardships and the Public Interest

Before issuing a preliminary injunction, courts also must weigh the potential harm to the

---

[15]Importantly, the Court's order expressly allows Defendants, at all times – including during the 2014-15 school year – to exercise its ordinary powers of oversight, including by seeking to revoke Reach's charter and by imposing reasonable conditions on Reach's continued operations.

moving party, in the absence of the requested relief, against the potential harm, if any, to the nonmoving party (and others not subject to the action) if the relief is granted. *See Council of Alternative Political Parties*, 121 F.3d at 879. "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks omitted). Finally, the Court must also determine whether a grant of preliminary relief would be in the public interest. As the Supreme Court has instructed, "[i]n exercising their sound discretion, [courts must] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Plaintiffs argue that the irreparable harm to them in the absence of a preliminary injunction (described above) would outweigh any harm that might be suffered by Defendants as a result of a Court order to renew Reach's charter for one additional year while this case proceeds to trial and a final judgment. Plaintiffs further assert that the "public interest is served by demanding Defendants comply with Federal and State law." (D.I. 7-1 at 24)

The Court agrees with Plaintiffs. "In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alternative Political Parties*, 121 F.3d at 883-84. That principle plainly applies here. And the irreparable harm to Plaintiffs that would occur here if the Court denied a preliminary injunction – essentially, that Reach would likely cease to exist before this case could be completed, so the educational opportunities it provides would be gone forever, even if Plaintiffs ultimately prevailed at trial – outweighs the harms to Defendants resulting from the granting of the

30

preliminary injunction.

Yet it is important to point out that there are harms to Defendants from the Court's ruling, and those harms factor into the public interest analysis as well. That is, there are "legitimate, countervailing concerns" on Defendants' side of the ledger.

Charter schools are mandated to meet measurable standards of student performance, *see* 14 Del. C. § 501, and Defendants are "statutorily required to determine whether [a charter] school is providing an adequate education to its students" (D.I. 14 at 23). Defendants insist that this is precisely what they have done here, necessitating "the tough decision not to renew the only all-girl public school in Delaware." (D.I. 9 at 5; *see also* D.I. 11 at 16 ("The Defendants indeed were forced to make the difficult and necessary decision not to permit the continued existence of a charter school that was performing at the academic-bottom of Delaware's public schools.")) The Court agrees with Defendants that "it is in the public interest that DOE not consent to allow a failing charter school to continue receiving the benefits afforded to charter schools when that school has repeatedly failed to meet its academic requirements and is moving in the wrong direction." (D.I. 14 at 24)

The Court further agrees with Defendants that "the public interest cautions against judicial interposition in the operation of a state public school system." (D.I. 14 at 3) It seems likely that the success of Delaware's charter school system depends, in part, on the State's ability to close a failing school – and on the understanding of all interested constituencies that the State can and will, when necessary, revoke or not renew some charters. It is not in the public interest for courts to make it more difficult for the State to properly exercise this authority and implement hard decisions supported by educational expertise. *See Richard Milburn Public Charter*

31

*Alternative High School v. Cafritz*, 798 A.2d 531, 547 (D.C. 2002) ("[An] obvious burden in the context of the charter revocation proceedings from additional procedural safeguards would be the delay involved by more elaborate proceedings, as well as the cost of continuing to provide public funding to charter schools that have flouted their statutory obligations while the revocation proceeding is pending.").

Though Defendants' concerns carry serious weight, the Court has determined that, on balance, the public interest favors preliminary relief for the Individual Plaintiffs.

## CONCLUSION

The difficulty of this case stems from the absence of any single-sex public charter school option for girls, now and – under current law – forever, all while Delaware provides that very option to boys. If the DOE's denial decision stands, all boys in the State of Delaware will have an option of attending a single-gender public charter school, while at the same time no girl in the State of Delaware will have such an option. At a time when the choice deadline was just weeks away, yet this case was still in its earliest stages, the parties presented the Court with only two courses of action: Defendants' planned imminent closure of Reach or Plaintiffs' request for a one-year extension of operations while this case could be litigated to a conclusion. Given the Court's findings, Plaintiffs' proposal was clearly the better of the two.

This conclusion is bolstered by the facts that, in the months leading up to Defendants' closure decision, Reach had moved into its new, larger facilities, on which it has signed a long-term lease; Reach had achieved full enrollment and had grown to its final grade configuration of K-8; and Reach had been removed from DOE probation in May 2013. (D.I. 1 ¶ 19)  Now may be a particularly auspicious moment for Reach to turn its academic performance around. At

32

minimum, another year of operations will provide additional data that should enable all interested parties to make an accurate assessment of Reach's program and competency.

Hence, for the reasons provided here, as well as those stated in the earlier Memorandum Order, the Court has decided to grant Plaintiffs' motion for a preliminary injunction and grant in part and deny in part Defendants' motion to dismiss.